IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LESLIE DALE CURTIS,<br><br>    Plaintiff,<br><br><br>        vs.<br><br><br>JO ANNE B. BARNHART, Commissioner of the Social Security Administration,<br><br>    Defendant. | ORDER AFFIRMING THE COMMISSIONER'S DECISION<br><br><br><br>Case No. 2:06-CV-00231 PGC |

Plaintiff Leslie Curtis brings this action for the court to review the Social Security

Administration Commissioner's denial of his application for disability and social security

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 405(g).  Mr. Curtis

argues the administrative law judge (ALJ) improperly assessed Mr. Curtis' credibility, incorrectly

assessed his residual functional capacity, and improperly relied on the vocational expert's

testimony in reaching a conclusion about Mr. Curtis' ability to work.  The Commissioner

counters that the ALJ used proper methods and reached supported conclusions as to each of Mr.

Curtis' claims of error.  The court finds the ALJ applied the correct legal standards and

substantial evidence supports his decision to deny Mr. Curtis disability insurance benefits, so the

court affirms the Commissioner's decision and denies Mr. Curtis' motion.

## FACTS AND FINDINGS

For purposes of this appeal, the court finds the following facts.

A.    *General Background*

On June 22, 2005, the date of the ALJ's decision, Mr. Curtis was fifty-four years old. He had completed eleventh grade, and had passed a high school equivalency test, the GED. He had previously worked as a truck driver, coal miner, and oil rig worker. Mr. Curtis claimed he became disabled on June 30, 2001, at the age of fifty, due to a combination of disabling impairments such as a work injury to his right knee, osteoarthritis of his left shoulder, degenerative disc disease, and an adjustment disorder with mixed anxiety and depression. Mr. Curtis filed applications for disability insurance benefits and supplemental security income benefits on May 30, 2003.

Mr. Curtis' history of right knee problems began in 1995, when he had surgery on his knee. But Mr. Curtis continued working with no problems until 2001. Then, in May 2001, a buoy line struck Mr. Curtis on the right knee while he worked on an oil rig. Mr. Curtis received further injury to his knee on June 30, 2001, when he tripped over a hose and fell down the stairs as he ran to turn off a valve on a gas well rig. Mr. Curtis responded to the Castleview Hospital, complaining of knee pain and swelling. X-rays showed an injury of uncertain age. The emergency room physician released Mr. Curtis to light work duty, diagnosing him with knee pain with previous osteochondritis dessicans, a new industrial injury possibly exacerbating the underlying problem, and a possible new ligament problem.

Mr. Curtis saw Dr. David Heiner for a follow-up evaluation of his knee on July 5, 2001. Dr. Heiner scheduled Mr. Curtis for a diagnostic and operative arthroscopy of his right knee — he performed the surgery on December 12, 2001.  Dr. Heiner found Mr. Curtis' postoperative course to be unremarkable.  He diagnosed Mr. Curtis with degenerative arthritis of the right knee, and discharged Mr. Curtis on December 17, 2001.

On May 2, 2002, Dr. Heiner examined Mr. Curtis again.  He noted that Mr. Curtis was progressively improving, had no signs of infection, and had a good range of motion.  Because Mr. Curtis needed to be able to walk five miles upon his return to work, Mr. Curtis requested additional rehabilitation time.  Dr. Heiner released Mr. Curtis to begin work on June 2, 2002.

Dr. Heiner again assessed Mr. Curtis on June 6, 2002.  He found Mr. Curtis' knee was well-aligned and looked good.  Mr. Curtis showed good motion and stability of the knee.  Dr. Heiner indicated that Mr. Curtis was doing "very well."  Mr. Curtis reported to Dr. Heiner that he walked three to four miles, with some pain.  But because Mr. Curtis felt unsure about his ability to escape the mine in case of an emergency, Dr. Heiner extended his work release to June 24, 2002.

Dr. Kirt Kimball began treating Mr. Curtis for his knee in August 2002.  Dr. Kimball recommended another surgery.  Specifically, Dr. Kimball noted that Mr. Curtis' prior total right knee arthroplasty had been technically acceptable, but needed to be revised due to changing alignment.  Dr. Kimball performed revision surgery on Mr. Curtis on October 15, 2002, at the Timpanogos Regional Hospital.  At a follow-up examination on November 1, 2002, Dr. Kimball found Mr. Curtis' knee was doing well, and his recovery was uneventful.  Mr. Curtis indicated he

was doing great.  At another visit, on December 2, 2002, Mr. Curtis told Dr. Kimball he was

doing very well, and experienced minimal pain.  Dr. Kimball found Mr. Curtis to have minimal

effusion, good stability, and increasing strength.  Mr. Curtis was recovering ahead of schedule,

and Dr. Kimball recommended he follow a self-directed workout program at a gym.  On January

10, 2003, Dr. Kimball again evaluated Mr. Curtis.  He found Mr. Curtis was doing well, and had

no apparent problems.  Dr. Kimball indicated that Mr. Curtis' right knee had a good, functional

range of motion, no effusion, and no instability.  Dr. Kimball called Mr. Curtis' surgical results

excellent.

On March 10, 2003, Mr. Curtis met with Dr. Scott Hardy, complaining of knee pain.  He

requested additional pain medication.  After looking into his pain medication history, Dr. Hardy

noted that Mr. Curtis' receipt of narcotic pain medications was concerning and turning into a

chronic problem.  Dr. Hardy reported a plan to taper Mr. Curtis off of narcotic pain medications

and his recommendation that Mr. Curtis see a pain specialist.

Mr. Curtis returned to Dr. Kimball on March 31, 2003, expressing that he thought he

could not return to work as a coal minor.  Mr. Curtis indicated he had done some work farming

and moving sprinklers, which caused some intermittent pain.  Dr. Kimball concluded that Mr.

Curtis was doing very well post-surgery, but had not fully rehabilitated.  Dr. Kimball advised Mr.

Curtis that he needed to do his own rehabilitation exercises to further improve.

On April 10, 2003, Dr. Alan Colledge evaluated Mr. Curtis' right knee.  Dr. Colledge

opined that Mr. Curtis would need to continue to take care with his activities.  He thought Mr.

Curtis would not do well with jobs involving extensive walking, squatting, kneeling, bending,

stair climbing, or ladder climbing.  Dr. Colledge indicated Mr. Curtis needed a job where he could sit or stand, as tolerated.

On June 6, 2003, Dr. Kimball again assessed Mr. Curtis.  Mr. Curtis requested pain medication.  Dr. Kimball noted that Mr. Curtis had been very physically active and experienced soreness afterward.  Mr. Curtis apparently told Dr. Kimball that he had been laying pipe, digging by hand.  After four or five hours of digging, his knee was sore.  Further, Mr. Curtis indicated he was caring for small children.  Dr. Kimball reportedly told Mr. Curtis he would no longer provide narcotics for him, but he did provide him with one last prescription.  Dr. Kimball noted Mr. Curtis' knee looked great, had full extension, full flexion to 130 degrees, no effusion, and good stability.  Dr. Kimball found nothing had changed at Mr. Curtis' follow up visit on September 10, 2003.

Mr. Curtis later objected to the ALJ's characterization of his June 2003 report to Dr. Kimball.  He maintains Dr. Kimball's note about laying pipe was incorrect.  Instead, Mr. Curtis claims that he merely said he *needed* to lay pipe but because he could not do so, he hired some college students to do the work for him.  This information was transmitted to the Commissioner by letter, after Mr. Curtis' evidentiary hearing in front of the ALJ.

On August 13, 2003, a State agency physician assessed Mr. Curtis' residual functional capacity, based on Mr. Curtis' medical records.  They physician found Mr. Curtis maintained the ability to perform light work, with occasional lifting of twenty pounds and frequent lifting of ten pounds, and occasional climbing, balancing, kneeling, and crouching, but with no kneeling or crawling.  The physician found Mr. Curtis could stand and/or walk for about six hours in an

eight-hour workday and sit for about six hours in an eight-hour workday.  Another State agency

physician affirmed this residual capacity assessment on December 16, 2003.

Also on August 13, 2003, a State agency physician completed a psychiatric review, based

on Mr. Curtis' medical records.  The physician found Mr. Curtis suffered from an affective

disorder (depression), but his impairment was not severe.  The physician also found Mr. Curtis

suffered from no functional limitations as a result of any mental impairment.

Dr. Elizabeth Allen, a psychologist, conducted a psychiatric examination of Mr. Curtis on

November 6, 2003.  She diagnosed him with an adjustment disorder with mixed anxiety and

depression.  She assigned him a global assessment of functioning score of fifty-five to sixty.  Dr.

Allen found Mr. Curtis' attention and concentration fell below average, but that his remote and

average recent memory was good, he had no social problems, and seemed capable of managing

his own funds.  Dr. Allen determined Mr. Curtis could understand, remember, and follow simple

one or two step instructions.

Another State agency physician completed a psychiatric review using Mr. Curtis' medical

records on December 2, 2003.  This physician found Mr. Curtis' affective disorder to be a non-

severe impairment.  The physician also found Mr. Curtis faced mild limitations performing daily

activities, maintaining social functioning, and maintaining concentration, persistence, or pace.

This physician found Mr. Curtis had faced no episodes of decomposition.

Dr. Matthew Wright performed an examination of Mr. Curtis on December 6, 2003.  Dr.

Wright first recorded Mr. Curtis' self-reported symptoms.  Upon examination, Dr. Wright

determined Mr. Curtis had a symmetric, steady gait, normal tandem walking, and good hand-eye

coordination.  He found Mr. Curtis to be alert, have good eye contact, and fluent speech.  Mr. Curtis exhibited an appropriate mood.  Mr. Curtis' concentration was good and his memory was normal — examination showed no neurological deficits.  Dr. Wright found that Mr. Curtis articulated words well.  He exhibited full strength, had no palpable muscle spasms, could rise from a sitting position without help, and had no problems getting up or down from the examination table.  The only limitation on Mr. Curtis' range of motion was an inability to flex his right knee past 100 degrees.  Mr. Curtis was able to lift, carry, and handle, light objects.  However, Dr. Wright determined Mr. Curtis could not kneel, repeatedly lift heavy objects, or complete "high strain" movements like running.  Dr. Wright noted Mr. Curtis had no depressed affect during the exam.

Mr. Curtis sought treatment at Four Corners Mental Health in January 2004.  Karen Dolan, a licensed clinical social worker, indicated Mr. Curtis appeared to be suffering from anxiety and depressive symptoms due to life stressors.  She indicated Mr. Curtis' apparent intellectual challenges may contribute to his frustration and ability find another profession.  Ms. Dolan assigned Mr. Curtis a global assessment of functioning score of fifty-two and recommended he begin a course of therapy to assist him in dealing with life pressures and to explore the usefulness of drug treatment.

On May 14, 2004, Mr. Curtis again fell — this time off of a truck at work.  Mr. Curtis sought treatment.  X-rays revealed no fractures or significant abnormalities of Mr. Curtis' spine, but did reveal some degenerative changes.  In addition, they revealed degenerative changes in his left shoulder.  They revealed no knee fractures or abnormalities.

Mr. Curtis sought treatment for knee pain, back, and left shoulder pain at Price Family Medicine from June to July 2004. Donna Mathis, a nurse practitioner, found Mr. Curtis' range of motion to be limited in his lumbar area, due to pain. Mr. Curtis' left upper extremity showed a full range of motion with no joint instability — just some tenderness. Ms. Mathis diagnosed Mr. Curtis with osteoarthritis in his shoulder, pain in his knee, and degenerative disc disease.

In December 2004, Mr. Curtis returned to Price Family Medicine for follow-up treatment, complaining of left shoulder pain and back pain. Medical personnel noted Mr. Curtis had a normal gait, a stable lumbar spine, and a full range of motion of the lumbar spine, with some pain. Due to pain, Mr. Curtis had a limited range of motion in his upper left extremity, but he had a full range of passive motion.

Mr. Curtis began physical therapy treatments at Castleview Physical Therapy in December 2004. Mr. Curtis participated in physical therapy through January 31, 2005. At that time, Mr. Curtis reported he had experienced an overall decrease in pain.

Mr. Curtis saw Dr. Randall Relyea in February 2005. At this visit, Mr. Curtis reported physical therapy, in conjunction with anti-inflammatory medicine, had decreased his shoulder pain, but his pain worsened with overhead activity. Mr. Curtis denied that he suffered from numbness or tingling of the arm. Dr. Relyea found Mr. Curtis' rotator cuff to exhibit 4/5 of full strength. From x-rays, Dr. Relyea determined Mr. Curtis suffered from moderate degenerative arthritic changes in his shoulder joint. Dr. Relyea encouraged Mr. Curtis to exercise and take anti-inflammatory medicine.

Dr. A.L. Carlisle, a psychologist, performed a psychological assessment of Mr. Curtis on

April 22, 2005.  Mr. Curtis reported that he had spent time in jail for selling prescription narcotic

pain pills.  He also reported that he was attending school.  Dr. Carlisle found Mr. Curtis'

intelligence to fall within the low-average range overall.  Dr. Carlisle concluded that despite

limited verbal functioning, Mr. Curtis could read well enough to perform most jobs.  Dr. Carlisle

assessed Mr. Curtis with a major depressive disorder, which is mild or moderate, and assigned

Mr. Curtis a global assessment of functioning score of fifty-five.

On May 4, 2005, Dr. Relyea performed arthroscopic surgery on Mr. Curtis' left shoulder.

Mr. Curtis participated in physical therapy in June 2005, but stopped after about nine sessions,

due to financial issues.

B.      *Benefits Hearing and Mr. Curtis' Appeal*

Mr. Curtis filed an application for disability insurance and supplemental security income

benefits on May 30, 2003.  The Social Security Commission denied his claim initially and upon

reconsideration.  Mr. Curtis requested and was granted a hearing before an ALJ.  The hearing

was held on May 11, 2005, in Salt Lake City, Utah, before Administrative Law Judge Kathleen

Switzer.  The ALJ issued a decision on June 22, 2005, finding that Mr. Curtis was not disabled

for social security purposes.  The Appeals Council declined Mr. Curtis' request for review, so the

ALJ's decision became final.  The final decision was issued on February 6, 2006.

At the hearing before the ALJ, Mr. Curtis testified that he had been taking three classes in

the mornings, but he was on a semester break.  For instance, Mr. Curtis had taken classes in auto

repair, welding, and Dutch oven cooking.  Mr. Curtis explained that on a typical day, he would

take his daughter to daycare in the morning, then go to his school to attend his three classes.

Upon return, he would get his daughter ready for preschool and drop her off.  In the afternoon, he would pick her up.  Mr. Curtis explained he was able to make his bed, wash dishes, and sometimes cook meals.  He did his own grocery shopping, but received help with his laundry and some other household chores.

Mr. Curtis admitted he had been arrested for selling prescription narcotic pain pills to an undercover police officer.  Beginning October 2004, he spent seventy days in the county jail for the offense.

Mr. Curtis also provided information as to his self-reported limitations.  He indicated he could lift and carry two one-gallon jugs of milk before his May 4, 2005, surgery.  In addition, he could lift his daughter (who weighed thirty-eight pounds) with his right arm.  Mr. Curtis could only walk four blocks because of his leg and back pain.  He explained he could sit for thirty minutes at one time but had to get up and move around for a few minutes before sitting down for another thirty-minute period.   Mr. Curtis could climb ten stairs at a time, and could stoop if he held on to something.  To alleviate his pain, Mr. Curtis would lay down two to three times a day.

After Mr. Curtis testified, the ALJ heard testimony from Dina Galli, a vocational expert. The ALJ requested Ms. Galli to work through certain hypothetical situations relating to an individual's ability to perform work when faced with certain limitations.  Specifically, the ALJ asked Ms. Galli to assess the work capacity of a claimant who:

> is capable of light work; sit/stand option; no climbing ladders, ropes, or scaffolds; other postural changes limited to occasional; occasional reaching all directions, including overhead with the left extremity; mild mental limitations in maintaining extended attention and concentration, and I will define some as some limitations

but can generally function well.[1]

Ms. Dalli testified that such an individual could perform none of Mr. Curtis' past work.  Further, Ms. Dalli found Mr. Curtis had no transferrable skills from his past work.  However, Ms. Dalli found some unskilled occupations in the economy that such a claimant could perform. Specifically, Ms. Dalli testified that the hypothetical individual could work as a survey worker, a ticket seller, or a parking lot attendant.  These jobs, according to Ms. Dalli, are representative of other jobs that may be available in the national economy.

On June 22, 2005, the ALJ issued a decision on Mr. Curtis' disability and social security claims.  Using the five-step sequential evaluation process,[2] the ALJ found Mr. Curtis suffered from severe impairments, but was not disabled because even with his limitations, he could perform work existing in significant numbers in the national economy.

Specifically, at step one, the ALJ found that Mr. Curtis was not engaged in any substantial gainful activity subsequent to the alleged date of onset.  At step two, the ALJ found that the objective medical evidence established that Mr. Curtis had medically-determinable severe impairments of left knee injury with two arthroplasty surgeries, osteoarthritis of the left shoulder, degenerative disc disease of the lumbar spine, and adjustment disorder with mixed anxiety and depressed mood.  At step three, the ALJ concluded Mr. Curtis' severe impairments failed to meet or equal any impairment in the Listing of Impairments under Appendix 1 of the

---

[1] R. 356.

[2] *See* 20 C.F.R. § 404.1520; *Fisher-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

regulations.[3]

At step four, the ALJ analyzed  Mr. Curtis' residual functional capacity and his past relevant work.  The ALJ found Mr. Curtis had the residual functional capacity to

> perform light work with the following limitations: He needs the opportunity to alternate between sitting and standing.  He can only occasionally; climb ramps or stairs, balance, stoop, kneel, crouch or crawl.  He is unable to climb ladders[,] ropes or scaffolds.  He can only occasionally reach overhead with his left arm, but he his right handed.  Finally, he has mild limits in maintaining attention and concentration for extended periods.[4]

The ALJ found these limitations prohibited Mr. Curtis from performing any of his past relevant work.

However, at step five, based upon the testimony of a vocational expert, the ALJ determined Mr. Curtis could perform a significant range of light work existing in the national economy.  Therefore, the ALJ found Mr. Curtis to not be disabled within the meaning of the Social Security Act.

After the ALJ's unfavorable decision, Mr. Curtis submitted additional evidence to the Appeals Council, seeking review of the ALJ's hearing decision.  But the Appeals Council adopted the ALJ's decision as the Commissioner's final decision.  Mr. Curtis now brings this action, seeking judicial review of the Commissioner's decision denying his application for social security and disability insurance benefits.

---

[3] *See* 20 C.F.R. § 404.1520(d).

[4] R. 25.

## STANDARD OF REVIEW

The standard of review for social security challenges is set forth in 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."[5]  In other words, the court reviews the Commissioner's decision to ascertain whether it is supported by substantial evidence in the record and to evaluate whether the ALJ applied the correct legal standards.[6]  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7]  The court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[8]  However, the court does not "reweigh the evidence or substitute [its] judgment for the Commissioner's."[9]

## DISCUSSION

The court finds the ALJ's conclusions to be supported by substantial evidence and free from legal error.  Under the Social Security Act, the Social Security Administration is authorized to pay disability insurance benefits only to persons who have a "disability," as defined by the Social Security Act.  A person is disabled only if his "physical or mental impairment or

---

[5] 42 U.S.C. § 405(g).

[6] *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *see also Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

[7] *Grogan*, 399 F.3d at 1261.

[8] *Id.* at 1262.

[9] *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[10]

In order to determine whether a Social Security claimant is disabled, the Commissioner has developed a five-step process.[11]  The claimant bears the burden of proof for steps one through four, and if the claimant fails to meet this burden, consideration of step five is rendered unnecessary.[12]  As the Tenth Circuit explained in *Fischer-Ross v. Barnhart*:[13]

> Step one requires a claimant to establish she is not engaged in "substantial gainful activity."  Step two requires the claimant to establish she has a "medically severe impairment or combination of impairments."  Step three asks whether any "medically severe impairment," alone or in combination with other impairments, is equivalent to any of a number of listed impairments so severe as to preclude "substantial gainful employment."  If listed, the impairment is conclusively presumed disabling.  If unlisted, the claimant must establish at step four that her impairment prevents her from performing work she has previously performed.  If the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience.[14]

In this case, the ALJ reached conclusions about Mr. Curtis' residual functional capacity at step four, and then denied Mr. Curtis' claim at step five, finding that while he had severe impairments, he was able to perform work existing in significant numbers in the national

---

[10] 42 U.S.C. § 423(d)(2)(A).

[11] *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988).

[12] *Williams*, 844 F.2d at 750.

[13] 431 F.3d 729 (10th Cir. 2005).

[14] *Id*. at 731 (citations omitted).

economy, such as work as a survey worker, ticket seller, or parking-lot attendant.  Mr. Curtis

disputes both the ALJ's residual functional capacity assessment at step four and her findings at

step five.

Specifically, Mr. Curtis argues the ALJ's credibility determination was unsupported by

the evidence, as were her conclusions regarding Mr. Curtis' residual functional capacity.  And

Mr. Curtis argues that because her hypothetical questions were allegedly based on a faulty

assessment of Mr. Curtis' limitations, the ALJ improperly relied on the opinions of the

vocational expert.  The Commissioner counters that the ALJ properly decided each issue and

provided a reasoned basis for her decisions.  Both parties have fully briefed this appeal to the

court, and the court finds oral argument on the matter to be unnecessary.  A review of the record

and the ALJ's decision reveals that the ALJ's findings as to Mr. Curtis' impairments and ability

to work are supported by substantial evidence in the record.

A.    *Credibility Determination*

First, Mr. Curtis objects to the ALJ's determination as to his credibility.  However, the

court finds the ALJ properly analyzed Mr. Curtis' credibility.  "Because exaggerating symptoms

or falsifying information for purposes of obtaining government benefits is not a matter taken

lightly . . . [courts] generally treat credibility determinations made by an ALJ as binding upon

review."[15]  "So long as the ALJ sets forth specific evidence he relies on in evaluating the

---

[15] *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990) (citation and internal quotations
omitted).

claimant's credibility, the dictates of *Kepler* [*v. Chater*][16] are satisfied."[17]  In this case, the ALJ adequately set forth the specific evidence she relied upon in evaluating Mr. Curtis' credibility and listed numerous grounds for finding Mr. Curtis' testimony to lack credibility.

First, the ALJ found the medical evidence failed to support Mr. Curtis' testimony. Substantial evidence supports this determination.  An ALJ must consider subjective complaints of pain along with the medical record to evaluate the claimant's credibility.[18]  However, the claimant's own complaints are insufficient, by themselves, to establish a disability, and the "medical records must be consistent with the nonmedical testimony."[19]  For instance, although Mr. Curtis testified to continuing knee problems, the medical evidence showed that Mr. Curtis' recovery after his knee surgeries went well and his knee condition remained relatively stable after the recovery.  Early on, Mr. Curtis reported he was doing great, and tests showed excellent knee component replacement.  By December 2002, medical records show Mr. Curtis' knee had improved in strength, had minimal effusion, and good stability.  In fact, Dr. Kimball indicated Mr. Curtis was recovering ahead of schedule, and he recommended that Mr. Curtis pursue a workout plan at a gym.  Again, in January 2003, medical records show Mr. Curtis had a good, functional range of motion, no effusion, and no instability of the knee.  By March 2003, Dr.

---

[16] 68 F.3d 387, 391 (10th Cir. 1995); *see also id.* (finding the ALJ's credibility determination to be inadequate because the ALJ simply recited the general factors he considered and then said claimant was not credible based on those factors).

[17] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

[18] *Talley*, 908 F.2d at 587.

[19] *Id.*

Kimball determined that Mr. Curtis was doing very well, and again recommended Mr. Curtis exercise. In addition, the record is replete with references to Mr. Curtis' normal, stable gait. By June 2003, medical records show Mr. Curtis could fully extend his knee and flex it to 130 degrees, and it still had no effusion and good stability.

In addition, the record substantially supports the ALJ's determination that Mr. Curtis' back and left shoulder problems did not prevent him from working. Tests as of May 2004 revealed no significant abnormalities or problems. Medical records from June 2004 show Mr. Curtis had full range of motion in his left shoulder and a stable joint. Further evidence with regard to the severity of Mr. Curtis' shoulder condition was lacking, as Mr. Curtis had just undergone arthroscopic surgery on his shoulder seven days before the hearing. While surgery may indicate a severe condition, no actual evidence supported it caused a disability as defined by the Social Security Act.

With regard to Mr. Curtis' mental limitations, medical evidence fails to support a claim of work-prohibitive disability. Dr. Allen determined Mr. Curtis possessed the capacity to understand, remember, and carry out simple instructions. She found his remote memory to be good and his recent memory to be average, and found him capable of managing his own money. Even though Dr. Allen concluded Mr. Curtis functioned in the range of low-average intelligence, he was able to read well enough to perform most jobs. Even considered in combination with Mr. Curtis' other impairments, the objective medical evidence provides a sufficient basis to uphold the ALJ's finding that Mr. Curtis' impairments were not disabling. Notably, none of the physicians who treated or examined Mr. Curtis reported that he had an inability to work. All-in-

all, the medical record evidence is sufficient to uphold the ALJ's determination that Mr. Curtis'
self-proclaimed limitations are inconsistent with the medical evidence.

The ALJ also found that Mr. Curtis' daily activities were consistent with light work and
provided a strong basis for discounting Mr. Curtis' self-reported limitations — a proper
consideration in evaluating credibility.[20]  For instance, Mr. Curtis had reported doing some
farming and moving sprinklers.  He testified that he attended three college classes each morning
the previous semester and provided primary care for his young daughter.  In addition, he testified
that he was able to complete household chores and care for many of his own needs.  Mr. Curtis
testified to his ability to lift two one-gallon jugs of milk at the same time and to lift his thirty-
eight pound daughter.

Mr. Curtis disputes the ALJ's reference, in her credibility determination, to a note by Dr.
Kimball.  The ALJ understood the note as saying that Mr. Curtis had personally laid 268 feet of
pipe.  Mr. Curtis contends that a post-decision letter by Dr. Kimball clarified that Mr. Curtis had
not laid the pipe himself, but had hired others to do so.  Even taking this as true, it is immaterial
because the ALJ relied on much more than Dr. Kimball's statement in discounting Mr. Curtis'
credibility and in assessing his residual functional capacity.  In fact, she only mentioned the pipe-
laying in one sentence and she provided three additional, independently sufficient reasons for
discounting Mr. Curtis' credibility.  For instance, the inconsistencies between the medical
evidence and Mr. Curtis' claimed limitations, by themselves, suffice as grounds to discount his
credibility.

---

[20] *See White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2002).

Finally, the ALJ noted that Mr. Curtis' arrest for drug sales undercut his credibility.  Mr. Curtis argues that his honesty in testifying about his criminal arrest, guilty plea, and jail time, shores up, rather than diminishes, his credibility.  Mr. Curtis contends also that his crime somehow verifies his inability to work and his desperate financial status.  But it is unclear to the court how Mr. Curtis' criminal behavior demonstrates an inability to work.  And even in absence of a crime of fraud or dishonesty, it is reasonable for the ALJ to conclude Mr. Curtis' criminal activity suggests dishonesty rather than honesty.  The ALJ could similarly conclude that the fact that Mr. Curtis may have used some of his prescribed medications to obtain money meant he did not need to use all of them for his claimed pain.

In sum, the ALJ provided specific and legitimate reasons for discounting Mr. Curtis' credibility and she utilized the proper standards.  The court, therefore, must find the ALJ's credibility determination to be controlling.

B.    *Residual Functional Capacity Determination*

Mr. Curtis also maintains the ALJ's assessment of his residual functional capacity is insufficiently supported by the evidence.  Residual functional capacity is defined as the most an individual is able to do after considering the effects of physical and/or mental limitations that affect the ability to perform in a work setting.[21]  Specifically, Mr. Curtis objects to the differences between the residual functional capacity determination of the ALJ and that of the State agency physician.  The court finds the ALJ accepted the majority of the State physician's conclusions and had legitimate grounds for rejecting two components.

---

[21] 20 C.F.R. § 416.945.

For one thing, the State physician performed the assessments of Mr. Curtis in August and December of 2003.  The ALJ, on the other hand, reviewed medical evidence up through May 4, 2005.  This is important because, as discussed previously, from the end of 2003 through May 2005, Mr. Curtis' right knee condition improved significantly.  And in May 2004, Mr. Curtis fell and injured his left shoulder and back.  The ALJ's residual functional capacity assessment had to account for Mr. Curtis' knee improvement as well as his left shoulder problems and back pain.

After considering this additional evidence, the ALJ determined Mr. Curtis could occasionally kneel or crawl.  Mr. Curtis points out this inconsistency with the State physician's conclusions, but fails to argue against it in light of the evidence.  As Mr. Curtis' largest claim of error, he argues against the ALJ's alleged failure to explain why she neglected to adopt the State physician's determination that Mr. Curtis could only sit for six hours in an eight-hour workday and only stand for six hours in an eight-hour workday.  Instead, the ALJ found that Mr. Curtis needed a sit/stand option.

The court is confused about Mr. Curtis' stance on this issue.  By finding Mr. Curtis needed a sit/stand option, the ALJ found Mr. Curtis to be more limited in his work options than the State physician had — not less.  It seems strange for Mr. Curtis to argue against a finding of greater limitation.  But Mr. Curtis implies the ALJ's limitation is somehow less restrictive than the State physician's and that the ALJ found Mr. Curtis is able to sit or stand for unlimited amounts of time.  Mr. Curtis misconstrues the nature of the limitation the ALJ imposed.  With a sit/stand option, Mr. Curtis can set his own time limits for sitting and standing.  For instance, Mr. Curtis could sit for four hours, then stand for four.  In short, he could arrange his sitting and

standing schedules however they best fit his needs, and could arrange them to fall under the respective six-hour limits set by the State physician.  Moreover, the ALJ's conclusion about the need for a sit/stand option is consistent with Dr. Colledge's recommendation that Mr. Curtis work where he can sit or stand, as needed.

The ALJ's conclusions as to the sit/stand option, therefore, are supported by substantial evidence.  And although Mr. Curtis generally objects to the ALJ's residual functional capacity determination, the only point Mr. Curtis actually argued against was the sit/stand option.  But on an independent review, the court finds the ALJ's residual functional capacity assessment as a whole to be substantially supported by the objective evidence, for the reasons outlined in the credibility section above.

C.      *Ability to Work at Jobs Available in the National Economy*

Finally, the ALJ properly assessed Mr. Curtis' ability to work at jobs available in sufficient numbers in the national economy.  Mr. Curtis argues that the ALJ's reliance on the testimony of the vocational expert with regard to this issue was necessarily flawed because Ms. Galli based her conclusions on an incomplete hypothetical question.  While it is true that testimony based on flawed hypothetical questions cannot constitute substantial evidence,[22] the ALJ's hypothetical question in this case accurately described Mr. Curtis' limitations and circumstances.

Mr. Curtis particularly objects to the ALJ's question about Mr. Curtis' mental limitations.

_____

[22] *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (citing *Ekeland v. Bowen*, 899 F.2d 719, 724 (8th Cir. 1990)).

He argues the ALJ described the limitations so vaguely, a valid answer was impossible.  But the court finds the ALJ's description of Mr. Curtis' mental limitations were specific enough to allow for a reasoned evaluation and grounded response by Ms. Galli.  The ALJ hypothetical question included the functional limitation of "maintaining attention and concentration for extended periods."[23]  No hypothetical question can perfectly correlate to the scenario at hand but the ALJ's question was sufficiently correlative and specific to Mr. Curtis' conditions to allow for an accurate response by Ms. Galli.

In sum, the court has already affirmed the ALJ's findings with regard to the nature and effect of Mr. Curtis' impairments — and the ALJ adequately incorporated these findings into her hypothetical question.  Because the court sees a reasoned basis for the ALJ's conclusions as to Mr. Curtis' impairments, the court fails to see how the questions posed to Ms. Galli were flawed. The ALJ, therefore, was entitled to rely on Ms. Galli's conclusions in denying Mr. Curtis' claims.[24]

### CONCLUSION

In short, the court finds the ALJ's determinations to be legally correct and well-founded in evidence.  Accordingly, the court upholds the Commissioner's decision denying disability

---

[23] R. 25.

[24]  *See Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993).

insurance and social security insurance benefits to Mr. Curtis and denies Mr. Curtis' request to

reverse the decision or remand the case.  The Clerk of the Court is directed to close the case.

DATED this 24th day of January, 2007.

BY THE COURT:

Paul G. Cassell
United States District Judge